## McCafferty *versus* Guyer *et al.*

59 109<br>J 171 519

1. A right conferred by the constitution is beyond the reach of legislative interference.

2. The legislature cannot confer the right to vote upon any classes' but those to whom it is given by the constitution; the description of those entitled excludes all others.

3. The 3d article of the constitution is not merely a general provision defining the indispensable requisites to the rights of an elector, leaving the legislature to determine who may be excluded. It is a description of who shall not be excluded.

4. The Act of June 4th 1866 (for disfranchising deserters) is unconstitutional.

May 18th 1868. Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Huntingdon county:* Of May Term 1868, No. 43.

This was an action on the case, No. 41, to April Term 1867, in which Edward McCafferty was plaintiff, and George Guyer, John C. Dickson and Alexander Ale defendants.

The following facts appear in a case stated, filed February 2d 1867. The plaintiff resided in Huntingdon county, Pennsylvania, and was liable to military service in the army of the United States. On the 30th of May 1864 he was regularly drafted into that service; he was duly served with notice of his draft, but refused to report and never did.report. He was registered by the provost-marshal of his district as a deserter. The plaintiff was an elector in the township of Warrior's Mark, Huntingdon county; the defendants were the judge and inspectors of the general election held in that township on the 9th of October 1866, and on that day the plaintiff tendered his ballot to the defendants, then acting as the election officers; at the same time there was produced to the same election officers a duly certified copy of the record of the rolls, showing that the plaintiff had been registered as a deserter, &c., as before stated. The defendants as election officers refused to receive his vote on the ground that he had been disfranchised by the Act of Congress of March 3d 1865, and the Act of Assembly of Pennsylvania of June 4th 1836. It was agreed that if the court should be of opinion that the plaintiff was a qualified elector, and had not been disfranchised by the above-mentioned acts or either of them, judgment should be entered for the plaintiff for $1; but if the court should be of opinion otherwise, judgment should be entered for the defendants. The court entered judgment for the defendants, which was assigned for error in the Supreme Court by the plaintiff, who took a writ of error.

[McCafferty *v.* Guyer.]

· *R. B. Petriken* and *G. W. Biddle*, for plaintiff in error, cited Act of Congress March 3d 1865, § 21, Brightly's U. S. Dig. 48, pl. 21; Act of Assembly June 4th 1836, §·1, Pamph. L. 1107, Purd. 1425, pl. 9; Constitution of Pennsylvania, art. 3, § 1; art. 9, § 11; Constitution of United States, Amendments, art. 5; Huber *v.* Reily, 3 P. F. Smith 115; Commonwealth *v.* Hartman, 5 Harris 119; Den *v.* Murray, 18 Howard 272.

*J. Scott*, for defendants in error, referred to the Constitution and Acts of Assembly, and Huber *v.* Reily, 3 P. F. Smith, *supra;* Sharpless *v.* Philadelphia, 9 Harris 160; Commonwealth *v.* Clark, 7 W. & S. 133; Commonwealth *v.* Maxwell, 3 Casey 444; Morrison *v.* Springer, 3 Am. Law Reg. N. S. 281; Laws agreed on in England 1682; Markham's Charter of 1696; Constitution of 1776, ch. 1, §§ 7, 8, 32; Hobbs *v.* Fogg, 6 Watts 557; Acts of July 2d 1839, § 117, Pamph. L. 544, Purd. 380, pl. 85, § 122, Pamph. L. 546; April 26th 1844, Pamph. L. 605, Purd. 376, pl. 48; Fletcher *v.* Peck, 6 Cranch 138; Merar *v.* Watson, ·8 Peters 110; Greenough *v.* Greenough, 1 Jones 495

The opinion of the court was delivered, July 2d 1868, by

STRONG, J.—The 1st section of the 3d article of the Constitution determines affirmatively who shall have the rights of an elector. It ordains as follows: "In elections by the citizens, every white freeman of the age of twenty-one years, having resided in this state one year, and in the election district where he offers to vote ten days immediately preceding such election, and within two years paid a state or county tax, which shall have been assessed at least ten days before the election, shall enjoy the rights of an elector." The section also ordains that a citizen of the United States who had previously been a qualified voter of the state, and removed therefrom and returned, and who shall have resided in the election district, and paid taxes as aforesaid, shall be entitled to vote after residing in the state six months; and also that white freemen, citizens of the United States, between the ages of twenty-one and twenty-two years, and having resided in the state one year and in the election district ten days as aforesaid, shall be entitled to vote, although they shall not have paid taxes.

By this charter the plaintiff in the case stated had the rights of an elector when he offered his vote. He had every qualification required by the Constitution. It is true, he had been drafted into the military service of the United States, had failed to report after notice of the draft, and he was registered as a deserter, but not having been tried and convicted of desertion, he had not lost his citizenship under the Act of Congress of March 3d 1865. This was decided in Huber *v.* Reily, 3 P. F. Smith 112. He was

[McCafferty v. Guyer.]

then entitled to vote, unless disqualified by the Act of Assembly of June 4th 1866. The 1st section of that act enacts that in all elections it shall be unlawful for the judge or inspectors of the election to receive any ballot or ballots from any person or persons embraced in the provisions, and subject to the disabilities imposed by the Act of Congress of March 3d 1865, and that it shall be unlawful for any such person or persons to offer to vote. The 2d and 3d sections impose penalties upon election officers for receiving such votes, and upon those disqualified as aforesaid for voting or offering to vote. The 5th and 6th sections prescribe what shall be the evidence of desertion and consequent disqualification, declaring it to be not the record of conviction and sentence, but certified copies of rolls and records, containing official evidence of the fact of the desertion of all persons who were citizens of the Commonwealth, and who were deprived of citizenship and disqualified by the said Act of Congress. The act thus denies the rights of an elector to all who under the Act of Congress have been registered as deserters from the military service of the United States, even though they have not been tried, convicted and sentenced for the offence. It attempts to disfranchise those who are enfranchised by the fundamental law of the Commonwealth, and it enacts what shall be the evidence of disfranchisement. It is not, it does not profess to be, a regulation of the mode of exercise of the right to an elective franchise. It is a deprivation of the right itself. Can then the legislature take away from an elector his right to vote, while he possesses all the qualifications required by the Constitution? This is the question now before us. When a citizen goes to the polls on an election day with the Constitution in his hand, and presents it as giving him a right to vote, can he be told, "true, you have every qualification that instrument requires. It declares you entitled to the right of an elector, but an Act of Assembly forbids your vote, and therefore it cannot be received." If so, the legislative power is superior to the organic law of the state, and the legislature, instead of being controlled by it, may mould the Constitution at their pleasure. Such is not the law. A right conferred by the Constitution is beyond the reach of legislative interference. If it were not so, there would be nothing stable; there would be no security for any right. It is in the nature of a constitutional grant of power or of privileges that it cannot be taken away by any authority known to the government. It involves a prohibition of interference with it. Thus it has been held that the bestowal of judicial power upon courts implies that the legislature shall not exercise it. So the gift of a right to grant pardons vested in the executive, is a denial of the possibility of granting pardons by any other branch of the government. It has always been understood that the legislature has no power to confer the elective

franchise upon other classes than those to whom it is given by the Constitution, for the description of those entitled is regarded as excluding all others. All these are only implied prohibitions. But the 3d article of the Constitution is positive and affirmative. It declares that the persons described shall have the rights of an elector. An Act of Assembly that enacts that they shall not, is therefore directly in conflict with it. It is plain, then, that the 3d article of the Constitution is not, as it has been argued, merely a general provision defining the indispensable requisites to the rights of an elector, leaving to the legislature to determine who may be excluded. On the contrary, it is a description of those who shall not be excluded. Undoubtedly power might have been conferred upon the legislature to restrict the right of suffrage. Such power has been given by the Constitutions of some other states, and the debates in the Convention that formed that under which we now live, show that it was contemplated by some of the members to introduce such a provision into ours. But it was not done, and therefore the right of suffrage is with us indefeasible.

An argument in support of the power of the legislature to disfranchise one to whom the Constitution has given the rights of an elector is attempted to be drawn from the practice under the former constitutions, as well as under the present. On examination, however, it will be found to have little weight. The Constitution of 1776 ordained that " every freeman of the full age of twenty-one years, having resided in this state for the space of one whole year next before the day of election for representatives, and paid public taxes during that time, should enjoy the right of an elector." It also declared that any elector who should receive any gift or reward for his vote, in meat, drink, moneys or otherwise, should forfeit his right to elect for that time, and suffer such other penalty as future laws should direct. On the 1st of April 1778 an act was passed requiring electors to take an oath of allegiance. But the history of the time shows us that this act was strenuously resisted as unwarranted by the Constitution, and within a very brief period it was swept from the statute book. The Constitution of 1790 followed. It left out the provision of that of 1776 respecting bribery. But in 1799 an Act of Assembly was passed enacting the omitted provision in the words used in 1776. Disfranchisement under it was never enforced, so far as I know; and it could hardly have been, for the offence was not complete until the vote was given. Since the Constitution of 1838 was adopted, the General Election Law, passed in 1839, enacted that the votes of persons who wagered on the result of any election shall be rejected. None of these Acts of Assembly have ever been sanctioned by judicial decision, and they are of little value in determining what the Constitution means. Uniform legislative practice might aid us in a case of doubt, but there has

[McCafferty v. Guyer.]

been no such practice, and the provisions of the Constitution are too plain to be disregarded. We hold, therefore, that the Act of Assembly of June 4th 1866 could not disfranchise the plaintiff, and that it did not justify the defendants in refusing his vote. According to the agreement of the parties in the case stated, judgment should have been given for the plaintiff.

Judgment reversed, and judgment entered on the case stated for the plaintiff for $1.

AGNEW, J., delivered the following dissenting opinion:—

This is an action on the case against the defendants as election officers for refusing the vote of the plaintiff on the ground that he is a deserter from military service, disfranchised under the Acts of Congress of March 3d 1863, and March 3d 1865, and the state law of June 4th 1866.

In the case of Huber v. Reily, 3 P. F. Smith 112, decided in 1866 before the passage of the state law of June 4th 1866, it was held by a bare majority of the court, my brother Read and myself dissenting, that the disfranchisement declared by the Act of Congress, "like all other penalties for desertion, must be adjudged to the convicted person after trial by a court-martial and sentence approved;" and that a board of election officers was incompetent to try the fact. These were the only points upon which the majority agreed, the judge who delivered the opinion holding that the Act of Congress declaring the disfranchisement "is in no sense *ex post facto*, and is not, for that reason, in conflict with the Constitution." He held its operation to be entirely prospective on the ground that "it is not a penalty for the original desertion, but for persistence in crime, for failure (in the language of the statute) to return to said service or to report to a provost-marshal within sixty days after the issue of the President's proclamation." He also held the act to be within the power of Congress in these words: "And I cannot doubt that as a penalty for crime against the general government Congress may impose upon the criminal, forfeiture of his citizenship of the United States. Disfranchisement of a citizen as a punishment for crime is no unusual punishment:" citing Parker v. The People, 20 Johns. 458.

The entire stress of the argument of my learned brother in that case was laid upon the position that a penalty or punishment for desertion could not be inflicted without a trial by a proper military court, and that a board of election officers was not empowered to try the offence and inflict the penalty. Looking at it as a question of *punishment* only, I would not differ from his view. But I thought that not the point, and endeavored to show that the question before the election board was in no sense a trial for a penalty, but was an inquiry into the right to a personal pri-

9 P. F. SMITH—8

vilege claimed by one then offering to exercise it; and the real question was whether Reily was then a qualified voter—one which the board was not only competent to try, but which it was its duty to decide; that this depended on his *status* or condition as a freeman, to be determined by the facts, as any other question relating to citizenship, as where a party loses it by removal out of the state, or emigration to and naturalization in a foreign country; that citizenship is simply a political right, a mere condition, which does not fall within the clauses of the Constitution protecting life, liberty and property, by securing the right of trial by jury; and if it did, a loss of citizenship by removal or other means could only be tried by jury and not by an election board.

The man who voluntarily relinquishes his condition of freemanship by refusing to yield military service stands in no different position as to his *status* in respect to his "free law," in other words, his *civil immunities* and privileges, than one who abandons his citizenship by removal. When he comes to claim a privilege founded on this *status*, this claim of free law, he himself demands an inquiry into its existence. He is not brought forward under the process of the state to answer for a public offence, or to receive its punishment, but he comes claiming an immunity to be tried by those who are appointed to investigate the claims of those who ask to be admitted to the privilege. This is a meagre outline of my views in Huber *v.* Reily, which, owing to the law then existing, were not reported. In order to give a full expression of them I shall incorporate that opinion into this by adding it at the close.

The case now before us differs from that case, having arisen since the Act of June 4th 1866. That act, founding itself upon the disfranchisement declared by the Act of Congress, prohibits deserters from offering and the election officers from receiving their ballots, and provides for the evidence to be received by them of the fact of desertion; thereby making it the duty of the election board to inquire into and determine the fact of the alleged desertion. We have now, therefore, express legislation by the state herself, determining the condition of the deserter and providing for a trial of his right when he offers to vote.

In the argument of this case it was conceded by the eminent senior counsel for the plaintiff in error, that if it were in the power of the legislature to change the *status* of the deserter as a freeman, the dissenting opinion in Huber *v.* Reily would probably be unanswerable. But he contended that the 3d article of the Constitution having prescribed the only qualifications of voters, it was not competent for the legislature to alter or destroy any of them, and he even asserted that one convicted of an infamous crime was not ineligible as a voter. This, therefore, is the principal question I shall now notice. I agree with the learned coun-

sel that the Constitution does affirmatively establish the qualifications of voters, and that they cannot be altered or added to. The language is: " In all elections by the citizens every white *freeman,* of the age of twenty-one years (having the prescribed qualifications), shall enjoy the rights of an elector." But who are the *freemen* of this Commonwealth—who are they that are to possess these prescribed qualifications of age, state and district residence, and payment of taxes? The argument of the plaintiff in error overlooked the all-important fact that the Constitution in no part of it defines who is a freeman, nor prohibits legislation which affects the condition of a citizen as a freeman, in consequence of his dereliction of duty as a citizen. There is no part of the Constitution which forbids the citizen to be deprived of his *liberam legem* for his disloyalty or his crime. The freemen of the state not being ascertained by the Constitution, the meaning of the word as a *descriptio personarum,* and as understood by those who used it, must be ascertained by its received sense at the time of the adoption of the constitutions which contained it. We must, therefore, resort to the laws, traditions, customs and general understanding of the people to discover it.

The word " freemen," the only term used in the Constitutions of 1776 and 1790 to describe the citizens who are electors was brought by William Penn from England in authentic records, which speak to us now with a clear and well defined meaning. The frame of government adopted by William Penn, on the 25th of April 1682, provided that the *freemen* of said province shall choose out of *themselves* seventy-two persons of most note for their wisdom, &c., to form the provincial council. The laws agreed upon in England between William Penn as governor and the freemen, on the 5th of May 1682, after reciting the charter of liberties, as it terms the frame adopted in the preceding April, provided in the second section as follows: " That every inhabitant in the said province that is or shall be a purchaser of 100 acres of land, or upwards, his heirs and assigns, and every person who shall have paid his passage, and taken up 100 acres of land at one penny per acre, and have cultivated 10 acres thereof; and every person that hath been a servant or bondsman, and is free by his service, that shall have taken up 50 acres of land and cultivated 20 thereof; and every inhabitant, artificer or other resident in the said province, that pays scot and lot to the government, shall be deemed and counted a *freeman* of the said province; and every such person shall and may be capable of electing or being elected representative of the people in Provincial Council or General Assembly in the said province."

Thus without reverting to the well-known tradition that the common law and its phrases were brought to this country by our ancestors, we have here the express evidence of the English origin

[McCafferty *v.* Guyer.]

of the term freeman, and its application to the people of this province. Then, turning to the English definition of "freeman" in Bouvier's Law Dictionary, we find him to be an allodial proprietor—the opposite of a vassal or feudal tenant—citing Robertson, Charles V., App., note 8; and in early English law a free-tenant or freeholder, one who held land freely as distinguished from a villein: citing Magna Charta, 9 Henry III., cap. 14; Id. John, cap. 20; 2 Just. 27. In modern law, a member of a corporation, company or city possessing certain privileges: 3 Steph. Com. 196–7.

So also a "freeholder" was a tenant: one who holds freely. This was peculiarly the right of a freeman. Hence, when a man gave lands to his villein "to hold freely to him and to his heirs," it made him a freeman.

"Freeman"—An allodial proprietor; one born or made free of certain municipal immunities or privileges : Wharton's Law Dictionary.

"Freeman"—One in possession of the *civil rights* enjoyed by the people *generally* : Bouvier's Law Dictionary.

"Scot and Lot."—Certain duties which must be paid by those, who claim to exercise the elective franchise within cities and boroughs before they are entitled to vote : Holthouse Law Dictionary.

This freedom of civil rights enjoyed by the freeman under the English law was termed his "free-law," and was liable to forfeiture for disloyalty, and upon conviction of an infamous crime. Infamous persons, says Blackstone, 3 Com. 370, are such as may be challenged as jurors *propter delictum*, and therefore shall never be admitted to give evidence to inform that jury with whom they were *too scandalous to associate*. Jurors attainted of a false verdict lose their *liberam legem*, and become for ever infamous : 3 Black. Com. 404. One of the effects of conviction and judgment for a capital crime was attainder, which was followed by a corruption of blood and forfeiture of estate : 4 Black. Com. 380–81. Attainder is recognised as existing here by the 19th section of the 9th article of the Constitution; but its effect in corrupting the blood, which prevented the transmission of inheritable estates, was removed, and the forfeiture confined to the life of the convict. Judgment of outlawry for a capital offence had the same effect : 4 Black. Com. 381. Under the Act of 31st March 1860, § 73, Purd. 264, a judgment of outlawry attaints of the crime, and has the same legal effect as a judgment upon verdict or confession for the offence upon which the party is outlawed. A remarkable instance of the loss of a man's "free law," was as the consequence of being vanquished in the trial by wager of battle, when the vanquished champion pronounced the "horrible word craven," and he was condemned as a *recreant, amittere liberam legem*, that

[McCafferty *v.* Guyer.]

is, to become infamous and not to be accounted *liber et legalis homo ;* being supposed by the event to be proved foresworn, and therefore never to be put upon a jury or admitted as a witness in any cause:" 3 Black. Com. 340.

Thus we perceive who a freeman was, how he might use his *status* as such, and that the English term was transplanted into the province by the founder. The common-law disqualification arising from conviction for treason, felony or any species of the *crimen falsi*, has always been recognised in relation to jurors and witnesses. The existence of the disqualification in these respects is the proof of its existence in others, for the disqualification is itself the effect of the loss of " free law." How then can it be asserted that the loss of a freeman's condition does not extend to his privilege as a voter ? In principle and reason no distinction can be made. To be a voter he must be a freeman; but if no longer a freeman, in ordinary logic, there is an end of his right to vote. And if we look to the reason of the thing the case is stronger. We are accustomed to think and indeed to boast of our institutions as founded on the *virtue* as well as the intelligence of the people. The motto of our state recognises virtue as standing in the van of liberty and independence. In the charter of privileges before cited the seventy-two persons constituting the council were to be " of most note for their wisdom, *virtue*, and ability." With such principles in sight, how can any one who by reason of his offences is " too scandalous to associate" with jurors, or to testify, be a fit person to mingle with freemen at the polls, and to affect their interests and govern them by his vote ? The true spirit of liberty and democracy forbids it. He is not a freeman. But I will not rest this point on my own views. The history of our institutions shows that the same views were held by those from whom they descended.

They held that the only persons who should share in the government were *free men*—men having " a common interest with and an attachment to the community," sharing the common burdens, *military* as well as civil, guilty of no disloyalty, and incorruptible by bribes. Thus in the laws agreed upon in England (§ 3) " That all elections shall be free and voluntary," " and that the elector that shall receive any reward or gift, in meat, drink, moneys or otherwise, shall forfeit his right to elect." This provision is repeated in the charter granted at the council of October 1696, under Lieutenant-Governor Markham. It is repeated also in the Constitution of 1776 (§ 32), with the addition, "suffer such other penalty as future laws shall direct." In the charter of Lieutenant-Governor Markham, the electors are described as those only who are " free *denizens.*" In the Constitution of 1776 the language is, " every *freeman.*" In the Constitution of 1790 the words are, " in elections by the citizens every *freeman.*" The

[McCafferty *v.* Guyer.]

language of the amended Constitution of 1838 is the same, excepting that it is restricted to *white* freemen.    Then if we go back to the formation of the Constitution, and consult the context also, we will find the freemen referred to therein distinctly characterized by their circumstances and duties.    Thus we may begin with the resolutions of the Provincial Conference, which assembled at Philadelphia, in June 1776, at the instance of the Continental Congress, to initiate a government for the state in lieu of the provincial scheme then existing.    These resolutions provided for the call of the convention which framed the Constitution of 1776.    The last resolution provided " that no person who has been published by any committee of inspection, or the committee of safety, in this province, as an enemy of the liberties of America, and has not been restored to the favor of his country, shall be permitted to vote at the election of members of said convention :" Conventions of Penna., p. 39.    The constitution formed by that convention, and finally adopted in September 1775, provides as follows :

Chap. 1, § 7 : " That all elections ought to be free, and that all freemen having a sufficient *evident common interest* with and *attachment* to the *community* have a right to elect officers and to be elected into office."

Sect. 8 : ".That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and *therefore is bound to contribute* his proportion towards the expense of that protection, and yield his *personal service* when necessary, or an equivalent thereto."

Sect. 5, chap. 2 : " The *freemen* of this Commonwealth and their sons *shall be trained and armed for its defence*, under such regulations, restrictions and exceptions as the General Assembly shall by law direct."

Following these lights and common understanding of the people, the legislature, in the Act of 15th February 1799, § 17, provided for the forfeiture of the right to elect on the part of those who received gifts or rewards for their votes.    And after the amendment of the Constitution, in 1838, the legislature, by the Act of 2d July 1839, declared the right to vote forfeited by wagering on elections and by accepting gifts or rewards, and this forfeiture is triable by the election board.    The ground is that these offences strike at the purity and freedom of elections, destroy their equality, and sap the very foundation of our entire political system by corrupting the persons who vote.    They are in fact no longer freemen.    These laws evidence the received interpretation of the people of their own constitution, and of the power of the legislature over this subject.

This mountain of authority, drawn from the ancient traditions of the people, their laws, constitutions, customs and general understanding as to who a freeman is, what his duties, and how he may

[McCafferty *v.* Guyer.]

lose his condition, prove that a voluntary deserter from his public duty relinquishes his privilege as a freeman—that he who refuses to defend his country when in peril, and by his desertion discovers his want of "interest with and attachment to the community," whose offence strikes at the very foundation of free government, is one who has no right to affect the interests of that community by his voice or vote. His fellow-citizens have a right to say to him that by crying "craven" in the trial by battle in which his country was engaged, he has lost his *liberam legem,* he is no longer a freeman, but a "recreant," who is unfit to govern those whom he deserted in the hour of their peril.

Congress having the right (conceded in Huber *v.* Reily) to disfranchise him as a citizen of the United States for his desertion, the state which, by the Federal Constitution, committed her war powers and means of defence to the general government, has the clear right to adopt and to apply that disfranchisement to his condition as a citizen of the state. The theory of the State Constitution is, that by the 1st section of the 1st article, the whole legislative power of the people is conferred upon the legislature, unless restricted in the bill of rights, or some other part of the Constitution. The only provision in the bill of rights is, that elections shall be free and equal. But elections are not equal when those who refuse to perform their public duties, and to bear *equal* burdens, are allowed to participate with and to govern those who do. They cannot claim the rights of freemen and at the same time decline to play the parts of freemen. This clause in the bill of rights is no restriction on the power of the legislature to regulate the civil *status* of those who voluntarily relinquish it by refusing to perform the duty to the community which citizenship requires of such member.

The election board being now authorized by the Act of June 4th 1866, to determine the fact of desertion, and the law having declared it to be a voluntary dereliction of state citizenship, the want of a tribunal to ascertain and determine it, as asserted at the time of Huber and Reily, no longer exists. Desertion not being an offence triable in the course of the common law, a trial by jury is not demandable of right, and the relinquishment of the privileged condition of a freeman is legally determined by the judge and inspectors of an election, when constituted, as they now are, a tribunal to ascertain the fact of desertion from which the relinquishment results. In further expression of my views, I now add my opinion in Huber and Reily, and would for these reasons affirm the judgment of the court below:

It is admitted that Henry Reily was a citizen of the United States, owed military service, and was duly enrolled, drafted and notified, and refused to report himself; and failing to appear, was

duly registered in the provost-marshal's office as a deserter, having neither furnished a substitute nor paid commutation.

The 11th section of the Act of Congress of the 3d March 1863, entitled "An act for enrolling and calling out the national forces," makes all persons enrolled subject to be *called into military service.* The 12th section provides for the call by the President, and its execution by a draft, and that those drafted shall appear within a fixed time after notice. The 13th section provides for commutation for service or substitution, and then declares—"And any person, *failing to report after due service of notice*, as herein prescribed, without furnishing a substitute, or paying the required sum therefor, *shall be deemed a deserter*, and shall be arrested by the provost-marshal, and sent to the nearest military post for trial by court-martial," &c. The 7th section of the law makes it the duty of the provost-marshals "to arrest all deserters, whether regulars, volunteers, militiamen, or persons *called into the service* under this or any other Act of Congress, wherever they may be found, and to send them to the nearest military post."

It is clear, therefore, that under this act Reily was called into the military service and became a deserter, subject to summary arrest and to trial by the express terms of the law. In this condition he was found by the Act of Congress, approved the 3d of March 1865, which provides "that in addition to the other lawful penalties of the crime of desertion from the military or naval service, all persons who have deserted the military or naval service of the United States, who shall not return to said service, *or report themselves to a provost-marshal* within sixty days after the proclamation hereafter mentioned, shall be deemed and taken to have *voluntarily relinquished* and forfeited their rights of citizenship and their rights to become citizens; and such deserters shall be for ever incapable of holding any office of trust or profit under the United States, or of exercising any rights of citizens thereof; and all persons who shall hereafter desert the military or naval service, and all persons who being *duly enrolled* shall depart the jurisdiction of the district in which he is enrolled, or go beyond the limits of the United States, with intent to avoid any draft into the military or naval service, duly ordered, shall be liable to the penalties of this section." Then follows the provision for the proclamation. The act is entitled "An Act to amend the several acts passed to provide for the enrolling and calling out of the national forces," &c., and being *pari materiâ*, applies to those who *fail to report* according to the Act of 1863, and are declared by it to be deserters. On the 11th of March 1865, President Lincoln issued his proclamation, reciting the law, and notifying all deserters to return to service or to report to a provost-marshal on or before the 10th of May 1865, extending pardon to those who did, and notifying those who did not of the

[McCafferty v. Guyer.]

penalty. This exposes to view the true operation of the Act of Congress of 1865. It came to the deserter with an offer of pardon for past offence if he would return to duty, but imposed the penalty of disfranchisement for his second act of disobedience if he failed to obey. The supposed *ex post facto* character of the law has therefore no place in the argument. It was not for his former desertion it inflicted the new penalty, but, placing him under a new call to duty, it disfranchised him for his new act of insubordination. Just at this point is seen the high necessity of a power to enforce the draft. The law would be *brutum fulmen*, and the draft but voluntary service, if the penalty for refusal be inadequate. Military service is an imperious necessity, dangerous to life, and requires even the death penalty to enforce it. Disfranchisement is far less, life being the gift of God alone, while citizenship is derived from government. Unable to deny the power to enforce conscription by the highest penalty, those who impugn the operation of these Acts of Congress fall back upon an alleged want of power to conscript, resting their argument against the plain and express words of the Constitution, not on a prohibition found elsewhere in the instrument, but upon strained inferences, and the feeble position that individual interest stands higher than national life.

I will not now discuss at large the power to draft, this having been done in Kneedler v. Lane, 9 Wright 238, 306. But as the authority of the second decision in that case was relied upon in the argument, and denied by one of the bench, I am bound, in defence of that decision, to say that no great national question has been so completely settled as this; not alone by the judgment of this court, but by the united voice of the people, the general government and all the states. In no state, that I remember, was any attempt made through its public functionaries to condemn the power or obstruct its exercise. And even here, if this state be considered an exception, the final judgment of this court placed it upon its acknowledged basis of constitutional right. The states in rebellion, under a constitution copied from our own in all these respects, exercised the power to its fullest extent. The example of an illegitimate government is entitled to no respect—but, as denoting the opinions of a class of men notorious for their strict construction of Federal powers, it has weight. Owing to this universal conviction of the nation's rightful powers, it stands at this day a living and happy illustration of their authority and the necessity of their exercise. A government without a power to enforce obedience to military duty, is a type of feebleness only parallel to its supposed inability to coerce a state into performance of its Federal duties.

The Federal Constitution was formed by men who had gone through the stormy period of war, and had lived to see the utter

[McCafferty *v.* Guyer.]

inefficiency to raise troops under the Articles of Confederation; who, having been familiar with the draft in the states, united to frame a government designed to form a more perfect union, to insure domestic tranquillity, and to provide for the common defence. They therefore conferred on Congress the most ample powers—"to declare war," "to raise and support armies," "to make rules for the government and regulation of the land and naval forces," "to provide for calling forth the militia," "to provide for organizing armies and disciplining them," "and to make all laws necessary and proper for carrying these powers into execution." Couching these grants of authority in language of the amplest signification, they added to them no exceptions or limitations to qualify or restrict. To these powers they superadded high and imperative duties—to provide for the common defence and general welfare, to execute the laws of the Union, suppress insurrections and repel invasions, to guaranty to every state a republican form of government, and protect each against invasion and domestic violence. Significantly omitting all obligation upon the states to perform these Federal duties, they added the prohibition that no state should grant letters of marque or reprisal, or, without consent of Congress, keep troops or ships of war in time of peace, enter into any compact or agreement with another state or engage in war unless when actually invaded, or in such imminent danger as would not admit of delay; and cutting off all means of raising supplies and munitions of war, by the further prohibition to coin money, emit bills of credit, or make anything but gold and silver coin a tender in payment of debts. These ample guarantees of protection against foreign and domestic foes would seem to need no further supplement; yet, not content with their express grant, the framers of the Constitution further declared that this frame of government, and the laws and treaties made under it, should be the supreme law, binding above all state constitutions and laws.

After all this concentration of power in a general government, charged with the highest functions of the states themselves, from which it was formed, for great national purposes and for their chief welfare, to suppose that its most vital power of protection and preservation was intended to rest on mere voluntary enlistment is so feeble in conclusion and full of non-sequence, so wanting in authority and inadequate to the fulfilment of its purposes, and so pregnant with ruin and loss of national existence, I cannot conceive how it is possible to adopt such a view. I take it, therefore, as a proposition sanctioned by the entire nation, and consecrated by the blood of thousands, that this nation possesses the power to exact military service of every able-bodied citizen.

National sovereignty, from its very nature, carries with it every element of national life. The duties of the government and the

citizen are reciprocal—protection from the one and fidelity and support from the other.

To say, therefore, that this government has no power to exact military service is to pass upon it sentence of death. Nor can we measure by any ordinary standard the benefits conferred upon the citizen by the protection his government affords. No matter on what wide or distant ocean his vessel may ride, no matter where his feet may press the sands of a foreign soil, no matter what power may assail his liberty or his rights, the flag of his country, her emblem of power, follows his wandering footsteps and covers him with its folds. The voice of her authority proclaims his protection, and her strong arm averts the blow. So we have been taught, so do all really believe; and yet how insignificant her voice, how feeble her arms, if she possesses no power to enforce her call for troops!

From the power to draft follows of necessity the power to declare a penalty for disobedience. Ch. J. Tilghman said, in The Commonwealth *v.* Irish, 3 S. & R. 176, note a: "By virtue of this power Congress can make laws to enforce the call, they may inflict penalties for disobedience, and erect courts for trial of offenders." In Moore *v.* Houston, 3 S. & R. 169, the same eminent judge said: "The object being to carry the militia into the field, Congress may inflict a penalty on all those who disobey the call of the President." It was decided also by the Supreme Court of the United States, in Houston *v.* Moore, 5 Wheat. 1, and Martin *v.* Mott, 12 Id. 19, that a militiaman who refused to obey the orders of the President calling him into public service was liable to be tried for the offence under the 5th section of the Act of Congress of 28th of February 1795. These authorities are wholly inconsistent with this theory of voluntary enlistment, and a want of power to enforce military service. The power existing, the extent of the penalty is within the discretion of the law-making power, whether it be to forfeiture of life or property, or the loss of citizenship.

Possessing power over the subject, Congress is not responsible for the consequences. If from a legitimate exercise of power over one right, another, dependent on it, necessarily falls, it is no argument against the power itself. With a loss of life all rights fail. If Congress punish piracy with death, it is no argument against the right to do so, that the offender thereby loses all his civil rights. This is an answer to the supposition that the Act of Congress which inflicts disfranchisement for desertion is an attempt to regulate state suffrage. It neither is nor proposes to be a regulation of suffrage, but simply declares a penalty for desertion, a subject within the Federal power. If a loss of suffrage follow that of citizenship, it is a consequence of the offence, not a regulation of suffrage. The state Constitution having hung on suffrage to citizenship, he who forfeits his citizenship by a vio-

[McCafferty *v.* Guyer.]

lation of valid Federal law cannot complain that as a consequence he has also lost his right of suffrage, any more than by conviction of his crime his wife and children have lost his protection and support. From the few short words "to establish post-offices and post-roads," flows the terrible power to take the mail robber's life, or imprison him for life. Yet who doubts that as a consequence of his crime he may lose his *liberam legem*, be stripped of his privilege as a freeman, and be excluded as a witness in a state court?

Unquestionably Congress has no right to regulate state suffrage. Our forefathers had no doubt of this, nor had we, until recent events have impressed some with a strong desire that it should be so, whose wish has therefore begotten the belief. This leads us to the question, does a loss of citizenship produce a loss of suffrage under the state Constitution? The Constitution says: "In elections by the *citizens* any white freeman of the age of," &c., "shall enjoy the right of an elector." A citizen of what? The answer immediately follows: "But a citizen of the *United States*, who had previously been a qualified voter of this state, and removed therefrom and returned, and who shall have resided in the election district, &c., shall be entitled to vote after residing in the state six months." Then follows something still more explicit in the proviso: "That white freemen, citizens of the *United States*, between the ages of twenty-one and twenty-two years of age, having resided, &c., shall be entitled to vote, although they shall not have paid taxes." It is very clear, therefore, that elections by the citizens means, according to the state Constitution, elections by citizens of the United States. Such citizenship being the basis of suffrage, it is unnecessary to inquire into the power of a state to extend suffrage to all others, or whether there can be a state citizenship independently of that of the United States.

The right of suffrage being made dependent on United States citizenship, we are confined by the terms of fundamental state law to that citizenship, and certainly upon this at least the legislation of Congress operates. The conclusion is inevitable that a voluntary renunciation of citizenship by desertion is a relinquishment of suffrage, and this being so, the question remaining is, how this *status* or condition of the person offering his vote is to be ascertained. It is alleged that it cannot be determined by the election board, notwithstanding it is the only tribunal established to determine in the first instance who are qualified voters.

In discussing this question there is a clear distinction between the positive pains and penalties inflicted upon the deserter, and the negative penalty of his *status* or condition in society. Each flows from the operation of this law; but for the infliction of the former, *punishment*, trial and conviction are essential; while the law itself having declared the latter, no active penalty being pro-

[McCafferty v. Guyer.]

vided, the law has provided no further steps, the punishment consisting in the simple condition of the deserter.    Should he never be pursued for positive punishment, his condition of voluntary disfranchisement still remains as his *status* under the law.    A full pardon is necessary to restore him.

The inquiry which an election board makes into the right of suffrage is not for the purpose of punishment, but simply to determine the existence of a privilege.    The applicant offers his vote, and must establish his right to it.    Citizenship is the first subject of inquiry under the Election Law, and must be ascertained before the vote can be deposited.    The provisions of the General Election Law of 1859 are plain—" every person claiming a right to vote at any election as aforesaid, shall, if required by either of the inspectors, make proof;" then follow five conditions of citizenship, of which the proof is to be made, viz., by birth, by settlement before the 28th of September 1776, by the oath of allegiance of a foreigner prior to the 26th of March 1790, by citizenship in one of the United States, admitted and recognised therein, and finally by naturalization.    The law then defines the proof to be made in certain cases.

Thus it is clear that the voter must establish his citizenship, and that the election board are the triers of the fact.    Under the Constitution the following facts must be proved by the voter to establish his right : 1. That he is a white man.    2. That he is a freeman.    3. That he is a citizen.    4. That he is of lawful age.    5. That he has the requisite state and district residence. 6. That he has paid the requisite tax.    The first fact, color, is ordinarily determined by inspection, a legal mode of proof.    But if inspection fail to establish his white blood, will any one say he cannot prove his white parentage, or that a qualified elector cannot rebut, by proof of black parentage, by permission of the board ?    As to the second qualification, freedom being the common condition of the people, he is presumed to be a freeman, but unquestionably this fact may be rebutted.    As to the third, citizenship, we have seen that it is not presumed, but by the express terms of the law it is to be proved if required by either inspector. Take the case of one born in the state and a voter for years, but who has voluntarily relinquished his citizenship here by removing to another state, or to a foreign country, say Great Britain, and has been there naturalized by Act of Parliament, will any one deny the right to show this loss of citizenship here or the power of the election board to determine the fact ?    The disfranchisement in such case is caused by the voluntary act of the citizen, and the act is that of removal and acquiring citizenship elsewhere. As a provable and triable fact, in what respect does it differ from a failure to report to the draft ?    That he was drafted, was a registered deserter, and failed to report under the proclamation,

[McCafferty *v.* Guyer.]

are facts simply, and just as capable of proof as· removal to Great Britain and naturalization there. Loss of citizenship is simply the legal consequence in either· case, whether by desertion or removal.

Then for what purpose are these facts proved before the board ? For the purpose of punishment or the infliction of a penalty ? No, not for these, but simply as facts on which the question of citizenship rests—a question which they must determine before he can be allowed to vote, under a penalty for admitting illegal votes as well as for excluding those that are legal. How is it possible to assert that an election board is incompetent to perform the very thing the law enjoins them to do ? The argument that trial and conviction are necessary to establish the fact of desertion as preliminary to disfranchisement is founded in the idea of inflicting a punishment, which is incorrect, as I have shown, and in the impression that there is some constitutional impediment to ascertain the disfranchisement in any other mode. But how· is the deserter to be tried ? Not by a jury, or indeed by any civil tribunal. It is a military offence, unknown to the common law, except so far as that law recognises its military character and jurisdiction. How, then, independently of the law which declares it, is disfranchisement to be established ? Not by a court-martial, for its proper province is to inflict the military penalties provided, but not to declare a mere loss of a disconnected right. A trial by court-martial is a trial for an offence, and the judgment of the court only declares the punishment to be inflicted by military law. But what power does military law confer over political rights ? Civil rights, such as those of liberty and property, may be involved in the consequences of punishment. But where is the power con ferred by military law to declare the loss of citizenship, or suffrage, or the capacity to hold civil offices ? The right of citizenship is simply political, a mere condition or *status* of the individual. It is not sufficient to tell us that conviction of desertion is necessary before the political *status* can be known. It is not denied that it *is* necessary before the punishment can be inflicted, but those who assert the conviction to be necessary to exhibit the state or condition of the deserter politically, must go further and show that the disfranchisement depends on the conviction, and that this conviction is the only legal evidence of the political *status* of the deserter. But where is this to be found in the law itself, or in any military code, to try the fact of disfranchisement ? It is just here their argument fails, for while they prove conviction to be necessary to punishment, they do not show that it is essential to the political *status*, or that there is any known power in a military court to pass sentence of disfranchisement; nor do they show that there is any lack of power in Congress to declare a loss of a political *status* without such a trial. A civil *status* is not a right

[McCafferty v. Guyer.]

falling within the constitutional guards over life, liberty and property. The right to be a juror, a viewer, a legislator, a magistrate or other civil personage, rests upon no constitutional grant and is guarded by no constitutional inhibition, but the qualification and the disqualification, whatever they may be, are simply declared by the Constitution or the law. All those clauses of the Constitution, such as secure the right of trial by jury, and against privation of life, liberty and property without due process of law, are inapplicable. Due process of law, meaning the law of the land, is not trial by jury alone, but (as often decided) is that proceeding which an Act of Congress or of Assembly provides, except where the common law declares otherwise: Murray's Lessee v. Hoboken Land Co., 18 Howard 276; Van Swartow v. Commonwealth, 12 Harris 131; Banning v. Taylor, 12 Harris 292. Hence summary convictions, settlements of accounts, assessments of damages and of taxes, taking property for public use, the location of highways, and other modes are committed to tribunals proceeding out of the course of common law. Precisely so is the trial of citizenship committed to the election board, preliminary to exercising suffrage.

When the Act of Congress declared that a deserter, failing to report, should stand in the condition of one renouncing citizenship, it deprived him of none of the fundamental rights these constitutional clauses protect, but left him in full possession of all his natural personal rights. His offence was political, against the right of his sovereign to his services; and his punishment is also political, to wit, privation of his citizenship. Unlike the natural rights belonging to man by creation, citizenship results from the law of government, and is regulated by the rule of the country in which it is claimed. Unlike those rights also, it may be relinquished. No one may voluntarily surrender his life except in response to a duty higher than life. No man may lawfully strip himself of the right of acquiring and holding property —voluntary pauperism is a crime against society. If to-day, by the most solemn instrument, he should release his right to acquire and hold property, to-morrow he could repudiate it as contrary to reason and to the welfare of mankind. But citizenship may be surrendered. This is recognised in the Constitution itself, which provides in the case of removal from the state a probation of six months' residence before the right can be fully resumed. Naturalization, under the law of Congress, is founded on the same principle, and the alien, on his admission, not only swears allegiance to this government, but renounces his allegiance to every other government, potentate or power. So far is the right of voluntary surrender recognised that even the declaration of an intention to become a citizen entitles him to the protection of our

[McCafferty *v.* Guyer.]

flag, and subjects him to military service.  Sect. 1, Act of March 3d 1863.

What did Congress mean when it declared that "such deserters," viz., those failing to return to service or to report for duty, "shall be *for ever* incapable of holding any office of trust or profit under the United States, or of exercising any rights of citizens thereof"?  Did they mean this only in the event of conviction of desertion in a military court?  Certainly not, or they would have said so, as they did in the proviso to the 4th section of the Act of 14th April 1802, that no person who has been *legally convicted* of having joined the army of Great Britain (to wit, a revolutionary tory) shall be admitted a citizen.  The context forbids the idea in saying that "all persons who, being duly enrolled, shall depart the jurisdiction of the district in which they are enrolled, or go beyond the limits of the United States, with intent to avoid the draft into military or naval service duly ordered, shall be liable to the penalties of this section."  Now, clearly, when Congress declared them incapable *for ever*, it did not mean that if they remained abroad until the war was over, the provost-marshals were disbanded, and the military courts discontinued, the disability should be condoned by their absence. If a deserter were to present himself to Congress for admission, would his disfranchisement be considered cured?  And how would the fact be inquired into?  Would a House authorized to judge of the qualifications of its members, remit him to a trial by court-martial?  Congress having declared the disability, but appointed no tribunal for its enforcement, it will not do to say it cannot be inquired into when it becomes necessary to be determined, not for punishment, but as a condition to the exercise of a personal privilege.  And Congress having declared it without reference to any conviction, it will not do to say it can be shown only by a conviction.

Upon the whole case I am of opinion that the election board had a right to determine the question of Henry Reily's citizenship, and for this purpose to ascertain the facts upon which his right to vote depended.

READ, J.—I concur in this opinion.